SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**WILLIAM M. McLAREN, OSB #143836**
Assistant United States Attorney
William.McLaren@usdoj.gov
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone: (541) 465-6771
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **6:25-cr-00493-MC-02** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **DERINSON MARTINEZ-GRANDAS,** | |
| **Defendant.** | |

Defendant Derinson Martinez-Grandas is a member of a seven-man crew that targeted and burglarized Asian American business owners in four cities spanning Oregon and Washington. Mr. Martinez-Grandas and his crew traveled from state to state, identified potential burglary victims, cased their homes and routines, destroyed glass doors to enter their homes, and stole their valuables. During these burglaries, the crew used encrypted seven-way calls and chats to coordinate perimeters and set lookouts. A masked crew member then approached the victims' homes with a fake food delivery. Once convinced their victims were away, the crew would break in and take everything worth anything.

**Government's Sentencing Memorandum**                                                                 **Page 1**

For Mr. Martinez-Grandas' role in the crime, the government recommends a sentence of twelve months and one day of imprisonment, forfeiture of the stolen proceeds, and a three-year term of supervised release.

## CONSPIRATORS

For the Court's ease of reference, the government provides the following information about Mr. Martinez-Grandas and his co-conspirators.  Throughout this memorandum, the government will use the naming conventions below:

- Derinson Martinez-Grandas will be referred to hereafter as "Martinez."  He is the subject of this memorandum.

- William Rodriguez-Gaviria will be referred to as "Rodriguez."

- Steven A. Quiroga-Solano will be referred to as "Quiroga."

- Jhon A. Quintero will be referred to as "Quintero."  He is the father of fugitive codefendants.

As of this filing there are several defendants who remain on fugitive status.

- Robinson A. Camacho-Rodriguez will be referred to as "Camacho."  He was removed from the United States by federal immigration authorities after the filing of state charges and released from state custody but prior to federal charges being filed.

- Jesson Quintero will be referred to as "Quintero Jr."  He is believed to be Mr. Quintero's son.  The government believes he has fled the United States.

- Jhon A. Quintero-Cadena will be referred to "Quintero-Cadena."  He is also believed to be Mr. Quintero's son.  The government believes he has fled the United States.

## FACTUAL BACKGROUND

The offense conduct is accurately set forth in paragraphs 23 through 38 of the Pre-Sentence Investigation Report (PSR), incorporated herein by reference.

Below is a description of the offense conduct, which played out over a series of burglaries beginning in Auburn, Washington then proceeding as far south as Eugene.  The

**Government's Sentencing Memorandum**                                                          **Page 2**

burglaries took place over a single week, beginning on October 3, 2025, and concluding on October 9, 2025.  PSR ¶ 23.  The crew traveled from city to city in four cars, rented Airbnbs, and divvied up stolen proceeds after their burglaries, each of which are outlined below.  *Id.* ¶ 24, 26.

### A.    Auburn Burglary

On September 30, 2025, Mr. Martinez rented an Airbnb in Tumwater, Washington, with a reservation checkout date of October 6, 2025.  *Id.* ¶ 27.  On October 3, the crew hit a residence in Auburn, Washington owned by an Asian American jewelry store owner who operates the business with his family.  *Id.*  The crew used a seven-way call on an encrypted voice call and texting platform—WhatsApp—during the burglary.  The crew members discussed the victim's business's open/close times in an apparent effort to triangulate his and his family's absence from the home.  *Id.*  Once they were in the clear, crew members shattered a rear sliding glass door.  *Id.*  They stole designer purses, watches, and other valuables.  *Id.*  After the burglary, the victim's family discovered a camouflaged trail camera hidden in the bushes of their yard.  This was consistent with photos later found on some of the burglars' devices depicting the front of the victim's home.

### B.    Eugene Burglary

The crew then traveled to Eugene, Oregon on October 5, 2025, and checked into another of Mr. Martinez's rentals, with a checkout date of October 10, 2025.  *Id.* ¶ 28.

The next day, they hit a Eugene home belonging to an Asian American family that owns and operates a Chinese restaurant.  They once again gained entry by shattering a sliding glass door.  They again coordinated their actions through a seven-way WhatsApp call.  Notably, the victim's security camera system malfunctioned at the same time as the burglary.  *Id.* ¶ 29.  The crew stole cash, jewelry, luxury bags, passports, and other travel documents.  *Id.*  Eugene Police

**Government's Sentencing Memorandum**                                                                 **Page 3**

Department ("EPD") detectives reviewed security system footage from the residence just prior to the system's malfunction. *Id.* The video depicted one of the burglars approaching the front door wearing a mask and carrying a pizza box, as depicted below at left. *Id.*

 

*Co-conspirator William Rodriguez-Gaviria with a pizza box at the Eugene house moments before the victims' security system goes dead on Oct. 5, 2025 (left); Same co-conspirator with a bag in the backyard of an attempted burglary victim in Gresham on Oct. 7, 2025 (right).*

### C.    Identification of the Crew's Vehicles and the Salem Burglary

Following the Eugene burglary, EPD detectives identified Mr. Martinez's distinctly-spoilered Honda Civic using surveillance aided by then-available Flock camera technology. *Id.* ¶ 30. Over the next several days, detectives used that technology to identify all four vehicles the various crew members were driving. *Id.* On October 9, 2025, another burglary occurred at a residence in Salem belonging to an Asian American family that were away working at their business. *Id.* Mr. Martinez had the burglary victim's address mapped on his cell phone that same day. The crew gained entry by breaking the side gate and shattering a rear window to access the rear door. *Id.* ¶ 31. During the burglary, the crew stole luxury bags, cash, and culturally significant jewelry. *Id.* For instance, the burglars took a Dol ring, which is gifted upon a child's first birthday, a significant milestone in Korean culture.

**Government's Sentencing Memorandum**                                    **Page 4**

Once again, the crew was using a seven-way WhatsApp call during the burglary. *Id.* One of the victims returned home as the burglars were finishing their hit. She recalled seeing them running through her back fence with bags and belongings stuffed under their arms and piling into one of their getaway vehicles.

### D.    Arrest and Search Warrant

After the Salem burglary, one of the surveilling officers identified Mr. Martinez's Honda Civic located about one mile from the Salem victim's home. One of the co-conspirators entered the vehicle carrying weighted bags suspected to contain burglarized goods, as depicted below.



*A co-conspirator walking to Mr. Martinez's Civic carrying purses and burglarized goods following the Salem burglary on Oct. 9, 2025.*

Later that day, the Civic was back at the crew's Eugene Airbnb. *Id.* ¶ 32. With the evidence they had collected by this point, EPD detectives obtained arrest warrants for the crew and search warrants for the Eugene Airbnb and devices. They surveilled the crew's rental as night fell and prepared to execute the warrants.

As officers approached the rental on October 9, 2025, Mr. Martinez and his six associates fled into the woods. Some took now-bagged valuables—like cash and jewelry—which were later recovered by law enforcement officers scattered or squirreled away in the woods behind the

rental.  The victims later confirmed that these valuables were not packaged at the time of the burglaries.

The crew members were eventually apprehended and charged by the Lane County District Attorney's Office.  In the search of the rental the night of the arrests, investigators discovered evidence of money wires to Bogota and Colombian travel documents.  *Id.* ¶ 36. Detectives found and seized commercially-available Wi-Fi signal jammers, which were plugged in—drained from that day's burglary and being recharged for future use, as depicted below.

 

*Plugged in Wi-Fi jammers found in the burglary crew's Airbnb on Oct. 9, 2025 (left); Screenshot of an online advertisement for the same device, describing it as a "Portable WiFi Jammer" (right).*

Detectives also located more than a dozen cell phones in the short-term rental, half of which were the burglars' personal phones and half of which were "work" phones.  Searches of the crew's phones revealed their techniques, searches, photographs, and mapping history in Washington and Oregon.  All seven cell phones directly associated with the crew members also showed that they had exchanged messages about specific locations, perimeters, and images of jewelry and pawn shop receipts matching items stolen from the residences.  *Id.* ¶ 38.

Beyond these devices, the burglarized goods from the various victims' homes were found scattered throughout the Eugene rental, including handbags matching descriptions of items stolen from Washington, as depicted below.

  

 

*Clockwise starting at top-left: Asian currency, United States currency, stolen wristwatches, and handbags matching the description of items stolen during the Auburn, Washington burglary, all found in the Eugene rental on October 9, 2025.*

### THE CHARGE, PLEA AGREEMENT, AND GUIDELINES COMPUTATIONS

Mr. Martinez pled guilty to a one-count Indictment, which charges him with conspiracy to commit interstate transportation of stolen goods, in violation of 18 U.S.C. § 371 and 2314. That charge carries a maximum sentence of five years' imprisonment, a $250,000 fine, and a three-year term of supervised release.

/ / /

### A. The Guidelines

The guidelines computations are set forth in the PSR at ¶¶ 43–53 and laid out below for the Court's reference:

| Provision | Calculation |
|---|---|
| Base offense level, USSG § 2X1.1(a) & 2B1.1(a)(2) | 6 |
| Loss amount (between $40,000 and $95,000), USSG § 2B1.1(b)(1)(D) | +6 |
| Use of sophisticated means, USSG § 2B1.1(b)(10)(C) | +2 |
| Zero-point offender, USSG § 4C1.1(a)(b) | -2 |
| Acceptance of responsibility, USSG § 3E1.1(a) | -2 |
| **Adjusted Offense Level** | 10 |
| Government-recommended upward variance, 18 U.S.C. § 3553(a) | +2 |
| Criminal History Category | I |
| **Resulting Guidelines** | 10-16 months |

To account for the sheer volume of burglaries carried out in a short timeframe and the selective targeting of a racial group—even without evidence of racial animus—the government recommends an upward variance as laid out above and a sentence of twelve months and one day of imprisonment.

Mr. Martinez was arrested by state authorities on October 9, 2025. He was released on bond on October 14, 2025, and then detained by immigration authorities on October 16, 2025. After the federal charges were first issued on November 4, 2025, he was turned over to the USMS and made his initial appearance in the District of Oregon. He has remained in custody since then and will have served approximately 246 days on the federal charges as of sentencing.[1]

---

[1] This matter was the subject of contested detention proceedings. Initial hearings occurred on November 6 and 20, 2025. Follow a release order by the United States Magistrate Judge, this Court held two additional hearings on November 25 and December 3, 2025. This Court revoked the release order and detained Mr. Martinez. On December 23, 2025, Mr. Martinez filed a Fed.

**Government's Sentencing Memorandum** **Page 8**

### B. The Sophisticated Means Enhancement Applies

Under the relevant guidelines subchapter—USSG § 2B1.1—a two level enhancement applies if the offense involved sophisticated means and the defendant intentionally engaged in or caused such conduct. § 2B1.1(b)(10)(C). "Sophisticated means" is defined as "especially complex or intricate offense conduct pertaining to the execution of the offense." § 2B1.1, App. Note 9(B). The crime here falls squarely into that definition. The crime of burglary can be carried out in unsophisticated ways, like one man kicking in a door to steal a television and loose cash. Or, as here, a crew of seven can carry out a series of carefully executed jobs to deprive certain targeted individuals of specific valuables.

Mr. Martinez and his crew drove from state to state, secured short-term rentals, then selected and surveilled their victims. Their selections were not random either. They scoured the internet for likely Asian-owned businesses (per Mr. Quiroga's search for "*restaurantes chinos*," among other things) and sifted through the results to confirm their owners' race, then tracked down their address. The crew used militaristic accuracy to carry out the four known burglaries: seven-way calls on dedicated phones, perimeters and lookouts, disguises to obscure their identity and purpose at the residences, and Wi-Fi jammers to knock out cameras. They had getaway drivers, used Colombian shipping companies, and made plans to send jewelry back to Colombia.

These burglaries were not crimes of opportunity, snap decisions, or run-of-the-mill smash and grabs. By any measure, they were "especially intricate or complex." The enhancement applies.

---

R. App. P. 9(a) memo. appealing the detention decision in the Ninth Circuit. The government filed a response brief on January 5, 2026. The Ninth Circuit affirmed this Court's order. *See United States v. Martinez-Grandas*, Case No. 25-7658, ECF No. 14 (9th Cir. Jan. 29, 2026).

**Government's Sentencing Memorandum**                                                    **Page 9**

### C.  Global Resolution

Mr. Martinez also faces charges in Lane County for the Eugene and Salem burglaries. Following the federal sentencing, the Lane County District Attorney's Office has agreed to recommend a sentence of 10 months' imprisonment to run concurrent to the federal sentence, contingent upon Mr. Martinez being sentenced to 12 months and one day of imprisonment in this case and pleading guilty in his Lane County case.  This global agreement is the subject of careful deliberations and negotiations between the parties.

### D.  Restitution

The victims have not asserted restitution requests in this case.  All seized burglarized items are to be returned to the victims upon completion of these and the state cases.

ARGUMENT

Mr. Martinez's conduct, numerous victims, racial targeting, and participation in this organized criminal activity all merit proportionate consequences.  This crew victimized four Asian American families in four cities in two states in six days.  In their spree, they stole their victims' valuables and peace of mind.  Families were left with shattered doors and fear they would be targeted again.  Their earnings from years of hard work were swiped by Mr. Martinez and his masked buddies in a matter of minutes.  And when the police arrived, they did not hang their heads and admit their shame, they scurried into the woods to avoid the logical consequences of their choices.

This burglary crew cased victims prior to the burglaries, they coordinated with extreme precision, they donned costumes, and they knocked out their victims' only layer of security with Wi-Fi jammers.  Mr. Martinez himself secured short-term rentals for the conspirators in Auburn and Eugene during the timeframe of the burglaries, he mapped the address of the Salem home

the day it was burglarized, and he returned to a Eugene Airbnb to package stolen property the night of the Salem burglary.

These burglaries were not merely lost valuables and broken doorjambs.  Profound psychological effects follow forcible intrusion into a person's most valued space.[2]  Research reflects that burglaries can shift one's fundamental assumptions about the world, shattering victims' perception that their home is inviolable.  *Id.*  This is not hypothetical, as the victims in this matter variously fear this will happen to them again, fear appearing in court, or fear leaving for their daily responsibilities.  All for Mr. Martinez and his friends to have their watches, cash, and purses.

Nor are the valuables in this case merely designer handbags.  They are the product of toil and sacrifice.  One victim said it best in an early-submitted impact statement:

> And although I can recall and recount this experience with genuine serenity, I cannot easily forget and shake off the associated horror and shock of that initial moment when I saw those burglary suspects and the half-second it took to visually triangulate the fence they broke down, and a designer bag in their hands that signaled they were in our home. It was my mom's first luxury purchase after a decade of recycling between two outfits from a now defunct K-Mart.

ECF No. 12-1.  The tragic irony that people leaving their homes to perform honest hard work are being targeted while away is discussed at length in the reporting on this subject.[3]  It is also captured in the sentiment of the victim's statement:

---

[2]      See Anjana Sharma et al., *Psychological Distress Among Domestic Burglary Victims: A Systematic Review of Possible Risk and Protective Factors,* 24 TRAUMA, VIOLENCE, & ABUSE 110 (2023) (collecting psychological studies reviewing the effects of burglaries on victims).

[3]      Amy Qin & Celeste Noche, *While Asian Immigrants Work, Burglars Target Their Homes,* N.Y. Times, Nov. 14, 2025, https://www.nytimes.com/2025/11/14/world/asia/asian-immigrants-burglaries.html.

**Government's Sentencing Memorandum**                                              **Page 11**

> Many immigrant families like mine strive for small business ownership after years of physically demanding work as a cafeteria cook, school custodian, grocery store clerk, etc.  This is especially true for Korean immigrants who are known to primarily own dry cleaners, convenience stores, and restaurants.  What devastated me most was the fact that my parents spent long days as business owners was taken advantage of.  The sacrifices my parents made, the long hours, and the grueling work seemed manipulated for maximum extortion.

ECF No 12-1.  Adding to the impact here is the crew's choice to target their victims based on their broad racial group—Asian American.[4]  While the evidence does not reflect the crew chose Asian Americans based on distain for their ethnic or racial identity, this kind of targeting shocks the conscience.  The victims in this case have expressed fear or anxiety about safety in their home as explained above, but that fear appears eclipsed by the feeling of being targeted.  Again, the victims' words speak directly to this point:

> This systematic targeting of Asian business owners didn't just affect my family, our possession, and personal feelings or safety.  It affects all the people who care so much about us and disrupts a sense of normalcy for us all.

ECF No 12-1.

Finally, the government's recommended sentence may serve to deter Mr. Martinez and others who would conspire to commit targeted burglaries in this community and elsewhere.  The recommended sentence would serve as a disincentive to those who would prey on Oregon's Asian American communities.  It would make clear that the Pacific Northwest is not a soft target

---

[4]    The government believes that the three-level enhancement for a defendant who intentionally selects a victim because of the victim's actual or perceived race, color, ethnicity, religion, or national origin does *not* apply. U.S.S.G. § 3A1.1(a).  This is because controlling case law suggests that enhancement applies in situations when defendants are motivated by hate or animus due to the victim's protected characteristics.  *See United States v. Patterson*, 119 F. 4th 609 (9th Cir. 2024).  The evidence in this case does not reflect hate or animus but instead suggests that the targeting was based on the perceived likelihood—however stereotypical and prejudicial—that Asian Americans would have more valuables in their homes.

**Government's Sentencing Memorandum**                                                    **Page 12**

for crime sprees originating in Los Angeles.  It would convey in simple terms to Mr. Martinez and others contemplating these choices that crimes against our Asian American neighbors carry consequences that far outweigh the value of purses and cash.  A high-end guidelines sentence informed by the recommended upward variance is sufficient but not greater than necessary to hold Mr. Martinez accountable.

## CONCLUSION

The government respectfully recommends the Court sentence Mr. Martinez to twelve months and one day of imprisonment, a three-year term of supervised release, and a $100 fee assessment.

Dated: July 1, 2026

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

*/s/ William M. McLaren*
WILLIAM M. McLAREN, OSB #143836
Assistant United States Attorney

*/s/ Emily C. Koehler*
EMILY C. KOEHLER
Law Clerk